IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KELLY KUNCHER,               )
                                  )
         Plaintiff,         )
                                  )
      v.                    )         CIVIL ACTION NO. 08-0302
                                  )
MICHAEL J. ASTRUE,       )
COMMISSIONER OF SOCIAL   )
SECURITY,              )
                                  )
         Defendant.      )

**MEMORANDUM OPINION**

CONTI, District Judge.

## I.    INTRODUCTION

Plaintiff Kelly Kuncher ("Kuncher" or "plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of the final determination of the Commissioner of Social Security ("Commissioner" or "defendant") denying plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33.  The parties filed cross-motions for summary judgment, and the record was developed at the administrative level.

## II.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB benefits on October 15, 2004, alleging disability since March 31, 2003, due to back pain and depression.  (R. at 26, 58, 74, 81, 344.)  Plaintiff's claims were initially denied, and he filed a timely request for an administrative hearing.  (R. at 28-32, 36.)  A hearing was held on December 8, 2005, in Latrobe, Pennsylvania, before an administrative law judge (the "ALJ").  (R. at 332-69.)  Plaintiff was represented by counsel, and

an impartial vocational expert (the "VE") also appeared and testified.  (*Id.*)  The ALJ issued an unfavorable decision on March 28, 2006, finding that plaintiff was "not disabled" within the meaning of the Act.  (R. at 11-21.)  The ALJ's decision became the Commissioner's final decision on January 11, 2008, when the Appeals Council denied plaintiff's request for review. (R. at 5-7.)  Plaintiff's administrative remedies being exhausted, he now brings the instant action seeking review of the Commissioner's final decision, and the matter is before this court on the cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

III.      STATEMENT OF THE CASE

     Kuncher was born on April 9, 1962.  (R. at 26.)  He is currently forty-seven years old and was forty-two years old at the time he applied for benefits and forty-three years old at the time of the administrative hearing.  (*Id.*)  Under the Commissioner's regulations, applicants under the age of 50 are considered "younger individuals" and their age is not considered a significant impediment in their ability to acclimate to unfamiliar occupational circumstances.  20 C.F.R. § 416.963.

     Kuncher earned his GED in 1980 and completed building trade maintenance vocational training that same year.  (R. at 79.)  Kuncher's past relevant work experience consists of twenty-plus years as a construction laborer, in which he primarily performed jackhammer work.  (R. at 75-76.)  Construction labor is considered to be very heavy work and unskilled.  (R. at 358.)

Kuncher discontinued working in construction in March 2003[1] due to his back pain and "other reasons." (R. at 75.)

In December 1998, Kuncher underwent a lumbar discectomy at L5-S1 (back surgery) on the left side. (R. at 138.) His back pain returned, however, in March 2003, necessitating the discontinuance of his labor activities. (R. at 184.)

Kuncher was seen at the Latrobe Area Hospital on May 20, 2003, for complaints of severe lower back pain. (R. at 183.) He was treated by Daniel DiCola, M.D. ("Dr. DiCola") with painkillers and prescribed physical therapy. (R. at 126, 183.) Kuncher completed twelve physical therapy sessions in four weeks, concluding on July 3, 2003; the physical therapist noted Kuncher had made progress toward his expected goals, although he was still limited with respect to some daily chores and tasks. (R. at 124-25.)

Kuncher was seen by Dr. DiCola on July 17, 2003, for a recurrence of his lower back pain. (R. at 180.) Kuncher was prescribed an MRI, x-ray and pain medication at this visit. (*Id.*)

Daniel J. Muccio, M.D., F.A.C.S. ("Dr. Muccio") evaluated the test results on October 6, 2003. (R. at 138-39.) Dr. Muccio opined:

> It is my impression that Mr. Kuncher developed back and right leg pain secondary to a disc herniation at L4-5 on the right. He developed back and left leg pain due to irritation of his prior operative site. He has been treated conservatively and most of his symptoms have resolved. For that reason, I recommended continued conservative care. We scheduled him for a CT guided epidural cortisone injection at L4-5. He is to contact us three days after the injection. If he responds favorably, we could consider completing a three-injection

---

[1]There is a discrepancy in the record that is clarified by Kuncher's testimony that it was in March 2003 when he stopped working as a construction laborer, but that he worked for approximately two hours in 2004 doing some cleaning for a construction company. (R. at 359-60.)

> series.  Other treatment options would include additional physical
> therapy.  Ultimately, if his left buttock symptoms remain refractory to
> conservative care, we could consider scheduling a myelogram and
> post-myelographic CAT scan in order to be absolutely certain that
> there is no evidence of left S1 nerve root compression.

(R. at 139.)

Kuncher received the three steroid injections between October and December 2003.  (R. at 193-95.)  Kuncher visited Dr. DiCola on February 3, 2004, again complaining of severe back pain, and was given a prescription for pain medication.  (R. at 179.)

Following the completion of his steroid injection therapy, Kuncher had a follow-up appointment on February 12, 2004, with Dr. Muccio.  (R. at 137.)  At that time, Dr. Muccio noted that Kuncher responded well to the treatment and that surgery was not recommended because Kuncher was not experiencing radicular symptoms.  (*Id.*)  Dr. Muccio prescribed a Medrol dosepak because Kuncher recently aggravated his back condition by performing a lifting and twisting motion.  (*Id.*)

On August 5, 2004, Kuncher returned to Dr. DiCola's office with complaints of low back pain radiating down the back of the left leg into the left foot, with numbness and tingling in the left leg.  (R. at 176.)  Additionally, Kuncher was experiencing pain radiating around the right hip into the right groin.  (*Id.*)  Kuncher was prescribed painkillers and ordered to undergo an MRI.  (*Id.*)

An MRI of the lumbar spine was performed on August 24, 2004, at Latrobe Area Hospital, which revealed at "L4-5 small right-sided disc protrusion, similar to the 8/8/03 MRI," and "L5-S1 post-surgical changes, including enhancing scar tissue surrounding the left S1 nerve root sleeve in the central canal, similar to the previous exam."  (R. at 292.)

4

Dr. DiCola referred Kuncher to Michael J. Rutigliano, M.D. ("Dr. Rutigliano"), who evaluated Kuncher on August 27, 2004, and concluded, "[b]ecause of the persistent nature of his symptoms and his failure of conservative measures, he has been offered a re-exploration L5-S1 discectomy, as well as decompression at L4 for the significant stenosis present at that level.  Due to the severity of his symptoms, he would like to proceed with the above-mentioned operation." (R. at 206.)  Dr. Rutigliano performed the surgery on August 31, 2004, at Latrobe Area Hospital. (R. at 154.)  Dr. Rutigliano discharged Kuncher the next day, noting "excellent resolution of his radicular pain."  (R. at 149.)

Kuncher was seen again by Dr. Rutigliano on September 9, 2004, at which time Dr. Rutigliano was "pleased to report [that Kuncher's] radicular pain has resolved completely."  (R. at 204.)

Five days later, however, on September 14, 2004, Kuncher returned to the hospital with fever, chills, shortness of breath, and wound drainage.  (R. at 159.)  He was diagnosed as having a postoperative staph infection at the surgical wound site.  (R. at 157.)  He was treated with IV antibiotics and discharged on September 17, 2004, with a referral for home health services to continue the IV antibiotic treatment for two weeks.  (R. at 158.)

Kuncher was examined by Dr. Rutigliano on September 24, 2004, at which time Dr. Rutigliano noted Kuncher was experiencing no radicular pain.  (R. at 203.)  Dr. Rutigliano ordered the continuation of IV medication and packing followed by oral suppression with Tetracycline.  (*Id.*)

Dr. Rutigliano conducted a follow-up examination of Kuncher on October 8, 2004, and reported that the wound had healed over but that it was still full.  (R. at 202.)  Dr. Rutigliano also

reported at this time that Kuncher was experiencing discomfort at the wound site, as well as some radicular discomfort. (*Id.*) Dr. Rutigliano suggested that it might be necessary to re-open the wound surgically to treat the infection. (*Id.*)

An MRI of the lumbar spine was performed on October 12, 2004, and revealed that the L4-5 disc herniation had decreased; the soft tissues of the lower lumbar spine underwent post surgical changes; the L5-S1 findings were unchanged; and a small spinal canal was developing at the L3-4 level. R. 208. W.J. Hoffman, M.D., a radiologist, noted that no evidence present suggested an active infectious process. (*Id.*)

On a follow-up visit on October 29, 2004, Dr. Rutigliano reported that the infection was superficial and treated with antibiotics and dressing changes, but that Kuncher was experiencing muscular discomfort around the incision. (R. at 201.) Dr. Rutigliano noted that the wound had healed nicely, and that Kuncher was experiencing no radicular pain. (*Id.*) Dr. Rutigliano recommended physical therapy to treat Kuncher's incisional discomfort. (*Id.*)

Kuncher registered for physical therapy on November 4, 2004, at Latrobe Area Hospital. (R. at 210.) The treatment plan was three sessions per week for six weeks. (R. at 211.) The plan of care consisted of moist heat, ultrasound, ice, soft tissue mobilization of the lower back, an exercise program, and education regarding proper body mechanics. (R. at 222.) Kuncher's responses on the Functional Health Intake Summary conducted during his registration indicate a high degree of limitation in his ability to engage in activities such as running, lifting heavy objects and sports, a slight degree of limitation in activities such as recreation, moving a table or pushing a vacuum cleaner, lifting or carrying items like groceries, lifting overhead, and walking several blocks. (R. at 224.) Kuncher indicated on the form that his physical health limits his

time on work or daily activities, that he can lift, "but it hurts," that he has no limitation in

climbing one flight of stairs, and that his pain prevents him from sitting for more than a half an

hour at a time. (*Id.*) Additional physical therapy findings include Kuncher ranking his pain as 1

out of 10, decreased lumbar active range of motion, limited straight leg raise, and Kuncher

reporting that he is unable to work due to his functional limitations. (R. at 222.) Kuncher's

rehab potential was indicated as good. (R. at 219.)

A consultative examination was performed on November 30, 2004, at the behest of the

Commissioner by Rodger C. Searfoss, M.D. ("Dr. Searfoss"). (R. at 230-35.) The results of that

examination indicate that Kuncher could lift or carry ten pounds frequently and twenty to

twenty-five pounds occasionally, that he could stand and walk five hours in an eight-hour

workday, that he had no limitations in sitting or pushing and pulling, that he could frequently

balance, occasionally bend, kneel, stoop and crouch, but that he could never climb, and that he

was unrestricted as to other physical functions and environmental conditions. (R. at 234-35.)

At a follow-up visit with Dr. Rutigliano on December 22, 2004, Kuncher reported low

back and radicular pain the previous week. (R. at 274.) Dr. Rutigliano observed that Kuncher

was returning to normal, and that progress in physical therapy was indicated as "good." (*Id.*)

Dr. Rutigliano prescribed Elavil[2] for Kuncher's low back and radicular pain. (*Id.*)

---

[2]Elavil is a brand name for the generic drug amitriptyline. Amitriptyline is an
antidepressant that elevates mood by raising the level of neurotransmitters in nerves of the brain.
Side effects include fast heart rate, blurred vision, urinary retention, dry mouth, constipation,
weight gain or loss, and low blood pressure on standing. Rare side effects include rash, hives,
seizures, and hepatitis. Amitriptyline can increase the risk of seizures.
http://www.medicinenet.com/amitriptyline/article.htm (last visited 9/14/09).

Kuncher saw Dr. Rutigliano on February 4, 2005, and reported improvement after taking Elavil.  (R. at 273.)  Although some minor leg discomfort and soreness persisted, Kuncher was experiencing no severe radicular pain.  (*Id.*)  Kuncher also discussed the possibility of returning to work at this visit, and Dr. Rutigliano recommended vocational retraining as opposed to returning to his previous work operating a jackhammer.  (*Id.*)  Kuncher indicated that he would discuss the recommendation with his union representative.  (*Id.*)

At an office visit on February 23, 2005, Dr. DiCola referred Kuncher to the pain clinic for steroid injection therapy to treat his chronic lower back pain.  (R. at 314.)  Kuncher reported to the Pain Control Center of Latrobe Area Hospital for treatment on March 21, 2005.  (R. at 288.)  Kuncher described his pain scale as 7 to 8 out of 10.  (*Id.*)  The procedure was stopped, however, due to Kuncher's apprehension.  (*Id.*)  Kuncher was given a prescription for Ultracet.[3] (R. at 290.)

Kuncher visited Dr. DiCola in May 2005, and received a prescription for Neurontin[4] for his continuing back pain.  (R. at 312.)

---

[3]Ultracet is a combination of two drugs, tramadol and acetaminophen, that is prescribed to relieve acute pain, such as that following a surgical procedure.  Tramadol is chemically related to the narcotic class of drugs such as morphine and hydrocodone, and therefore can cause psychological or physical dependence. http://www.medicinenet.com/tramadol_and_acetaminophen/article.htm (last visited 9/14/09).

[4]Neurontin is a brand name for the generic drug gabapentin.  Gabapentin is an anticonvulsant that is used for preventing seizures.  Gabapentin has also been prescribed for alcohol withdrawal, cocaine withdrawal, restless leg syndrome, hyperhidrosis, headaches, diabetic neuropathy, and fibromyalgia.  Side effects include dizziness, somnolence, ataxia, fatigue, hostility, nausea, and vomiting.  Additionally, gabapentin is in a class of medications associated with increased risk of suicidal thinking. http://www.medicinenet.com/gabapentin/article.htm (last visited 9/14/09).

Kuncher returned to the Pain Control Center on March 29, 2005, and, after he was given a dose of Visteril, was able to manage the steroid injection procedure. (R. at 282.) He was prescribed Tylenol with codeine. (R. at 285.) The same procedure was followed on April 14, 2005, and May 2, 2005. (R. at 277, 279.)

Kuncher's discharge report from the Pain Control Center dated June 14, 2005, revealed that at his last visit to the clinic he reported no significant relief after the series of steroid injections, and that he was still experiencing sharp pain, rated 8 to 9 on the pain scale, and that his sleep was disturbed. (R. at 276.)

Kuncher told Dr. DiCola that his pain had eased at an office visit on June 23, 2005, during which he received a prescription for a refill of his pain medications. (R. at 311.) Dr. DiCola saw Kuncher on September 13, 2005, and his prescriptions were refilled. (R. at 310.) Dr. DiCola assessed Kuncher as having failed back syndrome. (*Id.*) At Kuncher's appointment on October 27, 2005, Dr. DiCola noted bloodwork was positive for the presence of a Hepatitis C infection. (R. at 309.) At a follow-up appointment on November 17, 2005, Dr. DiCola ordered Hepatitis A and B prevention therapy and referred Kuncher to a gastroenterologist for infection therapy. (R. at 308.)

Dr. DiCola answered interrogatories from Kuncher's attorney on November 20, 2005, (R. at 304-06), and indicated that Kuncher would be unable to work eight hours in a day or work five days in a week because he "[c]annot live without pain sustaining meds." (R. at 304.) The questionnaire further revealed Dr. DiCola's opinion that Kuncher would be severely limited in his ability to carry, stand, walk, sit, climb, balance, stoop, kneel, crouch, crawl, and bend. (R. at 301-02.) Kuncher would be able occasionally to reach, handle, and push or pull with his upper

9

extremities, and frequently to finger and feel, but never to push or pull with the lower extremities.  (R. at 303.)  The clinical findings and diagnostic techniques supporting Dr. DiCola's conclusions are listed as "[s]erial examinations."  (R. at 306.)

A state agency physician, Dr. Bryan, completed a Residual Functional Capacity Assessment for Kuncher on January 5, 2005, in which he concluded that Kuncher could occasionally lift or carry twenty pounds, ten pounds frequently, stand, walk, or sit with normal breaks about six hours in an eight-hour workday, perform unlimited pushing and pulling activities, frequently climb ramps or stairs, occasionally ladders, and frequently balance, stoop, kneel, crouch, and crawl.  (R. at 248-54.)

Kuncher was treated for depression at the Latrobe Area Hospital Mental Health Center predating his disability onset date and continuing until at least the administrative hearing.  (R. at 237-42, 294-96, 356.)  On September 30, 2002, Kuncher was diagnosed with depression and prescribed Prozac.  (R. at 241.)  He was assessed a Global Assessment of Functioning ("GAF")[5] of 35.[6] (R. at 244.)  Kuncher was diagnosed with major depression, chronic, moderate on June 5, 2003, and his GAF was rated at 45.[7] (R. at 243.)  He reported a lot of anger and presented with a

---

[5]The GAF scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders*, (*DSM-IV-R*) 34 (4th ed. 2000).

[6]A score between 31-40 indicates some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g. depressed person avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.*

[7]A score between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).  *Id.*

blunted or flat affect. (*Id.*)  His prescription for Prozac was renewed, and his expected duration

of treatment was indefinite. (*Id.*)  On August 13, 2003, Kuncher reported that he still had anger

outbursts, but that he had been feeling better after taking Lexapro. (R. at 242.)  His GAF was

assessed at 45 and his treatment duration was indefinite. (*Id.*)  Kuncher switched prescriptions

from Lexapro to Prozac on October 8, 2003, due to sexual dysfunction. (R. at 241.)  His GAF

was assessed at 45 and his treatment duration was expected to be indefinite. (*Id.*)  On January 27,

2004, Kuncher's diagnosis was elevated to bipolar disorder II. (R. at 240.)  His GAF was

assessed at 55.[8] (*Id.*)  On September 21, 2004, Kuncher's diagnosis was indicated as major

depression, chronic, and his GAF was rated as 45. (R. at 238.)  In December 2004, his diagnosis

and GAF rating were the same. (R. at 237.)

On January 14, 2005, Manella Link, Ph.D., a state agency psychologist, completed a

Psychiatric Review Technique form in which he concluded that Kuncher had no significant

limitations in any work-related functions, but that he was moderately limited regarding

concentration, persistence or pace and mildly limited in activities of daily living and maintaining

social functioning.  (R. at 259-71.)

According to Kuncher's testimony at the administrative hearing, his daily activities

consist, in the main, of pacing back and forth, lying down, and reading motorcycle-themed

magazines.  (R. at 347.)  He is able to pay the bills and balance the checking account, bathe and

dress himself, although he reports some difficulty with socks, and he is able to prepare simple

---

[8]A score between 51 and 60 indicates some moderate symptoms (e.g. flat affect and
circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or
school functioning (e.g. few friends, conflicts with peers or co-workers). *Id.*

meals and tries to do some light housekeeping.  (R. at 348-51.)  Kuncher tries to visit his parents, who live across town, twice a week, and he tries to walk his dog.  (R. at 352.)

The testimony of the VE indicated that a hypothetical individual sharing Kuncher's restrictions and limitations could perform work existing in the national economy at the light exertional level as a tool distributor, hand stapler in a mailing company, photo developing machine operator, or a plastic design applier.  (R. at 363-64.)  That same hypothetical individual could perform work existing in the national economy at the sedentary level as a laminator, bench hand worker, or a glass product inspector.  (R. at 364-65.)

After determining that Kuncher met the insured status requirements of the Act through December 31, 2008, and had not engaged in substantial gainful activity since his protective filing, the ALJ found Kuncher's low back pain secondary to herniated disc surgery and depression to be severe impairments, but did not meet or medically equal, either singly or combination with other alleged impairments, any of the listings in 20 C.F.R. Part 404, subpart P, appendix 1, regulations No. 4 (20 C.F.R. §§ 404.1520(d) and 416.920(d)).  (R. at 15-16.)  The ALJ determined that Kuncher maintained the residual functional capacity ("RFC")[9] to engage in work activity at the light exertional level subject to certain modifications, which allow for limitations in postural movements, limitations in pushing and pulling with the lower extremities, environmental restrictions, a proscription against working near moving machinery or unprotected heights, and, if performing sedentary work, a sit/stand option that allows for taking four or five steps away from his work station for one minute up to five times per hour.  (R. at

---

[9]Residual functional capacity is "the most [the claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a).

17.)  Ultimately, the ALJ concluded that, although Kuncher was unable to return to his past relevant work as a jackhammer operator, a significant number of jobs existed in the national economy that Kuncher could perform, considering his age, education, work experience and RFC, and therefore he was not disabled within the meaning of the Act at any time relevant to the rendering of the ALJ's decision. (R. at 20-21.)

## IV.    STANDARD OF REVIEW

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The court may not undertake a *de novo* review of the Commissioner's decision or reweigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . " 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In order to establish a disability under the Act, a claimant must demonstrate a "'medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'" *Stunkard v. Sec'y, Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988) (quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423(d)(1).  A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  To support ultimate findings, an administrative law judge must do more than state factual conclusions.  The administrative law judge must make specific findings of fact. *Stewart v. Sec'y of HEW*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence contained in the record and must provide adequate explanations for disregarding or rejecting evidence. *Weir ex. rel Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has developed a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination

14

of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determined whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

Kuncher raises two arguments concerning whether the ALJ erred in his findings with respect to plaintiff's RFC. First Kuncher argues that the ALJ's RFC finding fails to adequately account for his physical limitations. Second, Kuncher argues that the ALJ's RFC finding is deficient because it did not include any mental health limitations. Each argument will be addressed.

A.    Physical limitations included in the RFC

Kuncher asserts that the ALJ failed to properly credit Dr. DiCola's statement that Kuncher could not perform eight hours of work per day even at the sedentary exertional level. Kuncher argues that the ALJ erred in disregarding Dr. DiCola's finding despite affording his opinion "great weight." Kuncher maintains that remand is necessary in order to have the ALJ properly frame a hypothetical question to the VE. The Commissioner retorts that substantial evidence supported the ALJ's determination.

Kuncher's argument on this point rests upon Dr. DiCola's responses to interrogatories furnished by Kuncher's attorney. These answers are curt at best and largely conclusory.

15

Kuncher asserts that Dr. DiCola's opinions expressed in the interrogatory responses are supported by the record and uncontradicted.

The ALJ noted, however, that the interrogatory answers are belied by medical evidence in the record, the other RFC assessments, and Kuncher's reported activities of daily living.  For example, in the interrogatory responses Dr. DiCola stated that Kuncher can only lift and carry less than ten pounds, he can stand or walk without interruption less than one hour, he can stand a total of less than one hour in an eight-hour workday, he can sit, without interruption, for less than two hours during an eight-hour workday, and can walk for less than two hours during an eight-hour workday.(R. at 301.)  These conclusions are dramatically more restrictive than those found on the RFC assessment completed by Dr. Bryan, in which he stated Kuncher could frequently lift or carry ten pounds and occasionally lift or carry twenty pounds, he could stand or walk six hours in an eight-hour workday, and sit six hours in an eight hour workday.  Dr. Rutigliano noted that after Kuncher's second surgery, his symptoms had largely relented and that he was experiencing no severe radicular pain.  Dr. DiCola's treatment records reveal that Kuncher was doing better with the medicine, and that his pain had eased.  Dr. DiCola's opinion that Kuncher should never climb, balance, stoop, kneel, crouch, crawl, or bend is contrary to Dr. Bryan's report that states Kuncher can frequently engage in each of those activities.

Dr. DiCola concluded that Kuncher is unable to work eight hours in a single day, unable to work five days in a single week, and unable to work eight hours in a single day without taking excessive breaks.  The basis for these conclusions is explained as "cannot live without pain sustaining meds." (R. at 304.)  Dr. DiCola describes his clinical findings and diagnostic techniques to support his conclusions as simply "serial examinations." (R. at 306.)  These

conclusions, however, are not accompanied by "medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.

Kuncher repeatedly points out that despite affording Dr. DiCola's opinion great weight, the ALJ ignored Dr. DiCola's findings in the interrogatory responses in making his RFC determination, which, in turn, resulted in incomplete hypotheticals to the VE.

The ALJ stated:  "As for the opinion evidence, great weight was given to the reports from treating sources. . . ." (R. at 19)  Dr. DiCola's responses to Kuncher's interrogatories constitutes an opinion from a treating source, and were embodied in the record.  Earlier in the decision, the ALJ, however, specifically gave less weight to Dr. DiCola's conclusions in the responses to the interrogatories by noting:

> The doctor's conclusion that the claimant is unable to work is not supported by the claimant's activities of daily living as noted in his testimony.  The doctor's conclusions as to the claimant's capacity to lift, carry, sit, stand, and walk are not supported by the other residual functional capacity assessments of record or by the negative test results noted in the medical evidence outlined below.  Moreover, a doctor's statement that a claimant is disabled is not determinative of the claimant's disability status in accordance with 20 C.F.R. 404.1527 and 416.927.  This is especially true at steps four and five of the sequential evaluation process where vocational factors must be considered.  In addition, the legal authority to draw conclusions as to a claimant's disability status is specifically reserved to the Commissioner in accordance with Social Security Ruling 96-5p.

(R. at 18.)  A review of the record in this case convinces the court that the ALJ considered the extreme limitations indicated in Dr. DiCola's interrogatory responses but gave them little weight in assessing Kuncher's RFC.  This distinction also serves to refute Kuncher's argument that the ALJ did not adequately explain the reason for discounting this evidence.  The lack of objective medical findings supporting these opinions makes it reasonable to reject them.  "The more a

medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(d)(3).  The ultimate determination of disability is a legal conclusion reserved exclusively to the Commissioner, and a treating physician's opinion on the matter is neither conclusive nor binding on the ALJ. 20 C.F.R. § 404.1527(e)(1) and (3).

The conclusions advanced by Dr. DiCola in responding to Kuncher's attorney's interrogatories are inconsistent with the medical evidence on the record as a whole and Dr. DiCola did not provide any objective medical evidence to support these extensive limitations.  A treating physician's opinion is only controlling when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . . ." 20 C.F.R. § 404.1527(d)(2).

Additionally, Dr. DiCola's opinions expressed in response to the interrogatories were in the format of check-box and fill-in-the-blank answers and he provided scant explanations to support his various conclusions.  "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).  The ALJ noted that Dr. DiCola's opinions expressed in the responses to the interrogatories are inconsistent with Kuncher's reported activities of daily living, which include caring for his personal needs, preparing simple meals, sweeping or vacuuming for ten to fifteen minutes, washing dishes, walking his dog, and visiting family and friends.

Under these circumstances, the court concludes that the ALJ did not err in affording little weight to Dr. DiCola's answers to the interrogatories and not including those physical

18

limitations in the hypothetical posed to the VE which was relied upon by the ALJ.  Hypothetical

questions posed to a vocational expert must include impairments that are supported by

"medically undisputed evidence" in the record.  *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir.

2002); *see Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999) (a proper hypothetical question is

one which "fairly set[s] forth every credible limitation established by the physical evidence.").

For the reasons discussed above the court finds that the ALJ's RFC determination concerning

plaintiff's physical limitations and the hypothetical question posed to the VE, which was relied

upon by the ALJ, contained all Kuncher's credibly established physical limitations that were

supported by substantial evidence.

B.	Mental health limitations

Kuncher argues that the ALJ's RFC finding is deficient because it failed to include

provisions for his mental limitations due to his depression.  The Commissioner argues the ALJ's

hypothetical question to the VE contained all of Kuncher's limitations supported by the record.

Kuncher's argument is essentially that the ALJ found his depression to be severe at step

two of the sequential analysis, but that the ALJ failed to provide for his mental impairments

when making the RFC assessment.  In the first paragraph under the RFC finding in his decision,

the ALJ only discussed Kuncher's physical limitations.  Further in the analysis the ALJ,

however, discussed Kuncher's mental limitations, finding that "his depression has improved and

his normal affect undercuts his allegations as to continuing depression." (R. at 19.)  The ALJ

included mental health restrictions when posing the hypothetical questions to the VE at the

administrative hearing, and those restrictions were considered when the VE identified jobs

existing in significant numbers in the national economy that a hypothetical individual sharing Kuncher's particular limitations could perform.

The ALJ attempts to support his mental health findings in Kuncher's RFC by relying on records from the Mental Health Center at Latrobe Area Hospital.  The ALJ notes that "by August 2003, [plaintiff's] angry outbursts had lessened with the use of Lexapro and his sleep and appetite were normal.  By October, he displayed a bright affect and he was switched from Lexapro to Prozac.  He was later described as having an appropriate or elated affect.  He continued to be alert and oriented." (R. at 19.)

The treatment records from August 2003, however, reveal that Kuncher was still experiencing anger outbursts, but that he had felt better while taking Lexapro. (R. at 242.) As the ALJ noted, on his next visit in October 2003, Kuncher's prescription was changed from Lexapro to Prozac at his request due to sexual dysfunction. (R. at 241.)  In August 2003, Kuncher's affect was flat, his mood was labile and angry, he was diagnosed with major depression, chronic, moderate, and assigned a GAF of 45. (R. at 242.)  His expected duration of treatment was listed as indefinite. (*Id.*)  In October 2003, despite displaying a bright affect, his GAF was again assessed as 45, and his diagnosis and treatment duration impression were repeated. (R. at 241.) In January 2004, his diagnosis was bipolar disorder II (R. at 240); and in September 2004 his diagnosis was major depression, chronic.  (R. at 238.)

Kuncher focuses much of his argument on the consistent GAF rating of 45 assessed by his mental health providers to support his allegation of error that the ALJ did not sufficiently address his mental limitations.  Initially, the court notes that the Social Security Administration has explicitly declined to endorse the use of the GAF scale because its scores do not have a

direct correlation to the disability requirements and standards of the Act. *See* 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000). Low GAF scores may relate to factors unrelated to the ability to maintain gainful employment. "'[A] GAF score, without evidence that it impaired the ability to work, does not establish an impairment." *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D.Pa. May 21, 2008) (citing *Camp v. Barnhart*, 103 Fed.App'x 352, 354 (10th Cir. 2004) (quoting *Parsons v. Astrue*, Civil Action No. 06-217, 2008 WL 539060, at *7 (N.D. Fl., Feb. 22, 2008)). Thus, the GAF scores are not necessarily indicative of plaintiff's inability to work.

The court is mindful, however, that "GAF scores constitute medical evidence that is accepted and relied on by physicians, and that where an ALJ fails to explain why the scores have been discounted, a remand is necessary." *Cressman v. Astrue*, Civil Action No. 06-4290, 2007 WL 2248832, at *2 (E.D.Pa. Aug. 1, 2007). In *Cressman*, like in Kuncher's case, "the ALJ did not include any review of the GAF scores in her decision and thus failed to explain her apparent rejection of this medical evidence of serious impairment." *Id.*; *see Colon v. Barnhart*, 424 F.Supp.2d 805, 812 (E.D.Pa. 2006) (noting the GAF scale "constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability"); *Watson v. Astrue*, Civil Action No. 08-1858, 2009 WL 678717, at *6 (E.D.Pa. Mar. 13, 2009) (noting that case law provides that "remand is necessary when an ALJ fails to specifically discuss GAF scores").

An administrative law judge

> must "explicitly" weigh all relevant, probative and available evidence. . . . [and] must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. . . . The [Commissioner] may properly accept some parts of the medical evidence and reject other parts, but she must *consider* all the evidence and *give some reason for discounting* the evidence she rejects.

*Adorno*, 40 F.3d at 48 (emphasis added; citations omitted).  S*ee Fargnoli v. Massanari,* 247 F.3d 34, 42-43 (3d Cir. 2001) (although an administrative law judge may weigh conflicting medical and other evidence, he or she must give some indication of the evidence that he or she rejects and explain the reasons for discounting the evidence; where an administrative law judge failed to mention significant contradictory evidence or findings, the court was left to wonder whether he considered and rejected them, or failed to consider them at all, giving the court "little choice but to remand for a comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this circuit. . . .");  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) ("In making a residual functional capacity determination, the ALJ must consider all evidence before him. . . .  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. . . . 'In the absence of such an indication, the reviewing Court cannot tell if significant probative evidence was not credited or simply ignored.' *Cotter*, 642 F.2d at 705.") (additional citations omitted).

Due to the ALJ's cursory analysis of Kuncher's mental health condition in making his RFC determination and failure to comment on the consistent GAF scores, the court is unable to determine whether the decision is supported by substantial evidence.  The ALJ failed to mention the longitudinal nature of Kuncher's mental health diagnoses and failed to account for why he afforded no weight to plaintiff's low GAF scores.  While the ALJ included accommodations for mental impairments in the hypothetical posed to the VE, i.e., the "[p]erson will be limited to simple, routine, and repetitive tasks, not performed in a production- or quota-based environment, which involves simple work-related decisions" (R. at 363), this court cannot tell whether the ALJ

22

credited or ignored the mental health diagnoses and GAF scores when relying on the VE's testimony or whether additional limitations would be appropriate.

Because the court concludes the ALJ did not adequately explain his rejection of evidence from treating sources regarding Kuncher's mental health, the case must be remanded for further proceedings.

## VI.    CONCLUSION

For all the foregoing reasons, the Commissioner's motion (Docket No. 9) is denied. Plaintiff's motion (Docket No. 7), to the extent it requests remand, is granted.  An appropriate order shall issue.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 16, 2009